ESTATE OF W. EUGENE BOUNDS, DECEASED, JANE T. BOUNDS AND JOHN B. LONG, II, CO-PERSONAL REPRESENTATIVES, AND JANE T. BOUNDS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Estate of Bounds v. Commissioner
Docket No. 3351-81.
United States Tax Court
T.C. Memo 1983-526; 1983 Tax Ct. Memo LEXIS 261; 46 T.C.M. (CCH) 1209; T.C.M. (RIA) 83526; August 25, 1983. *261 During the years 1974 through 1977, the decedent made approximately 16 loans, five of which are at issue herein. Several of the loans were made to business or social acquaintances, as well as to entities in which the decedent held a direct ownership interest. The decedent's lending activities did not occupy a substantial amount of his time and effort. Most of his tme was devoted to, among other things, his duties as an employee and later a consultant of a corporation. The decedent did not file a schedule C with respect to his lending activities during 1974 through 1977 and listed his occupation on his tax returns as that of executive. Held, the decedent was not in the trade or business of lending money during the years 1974 through 1977 and, accordingly, is not entitled to a business bad debt deduction for the five loans at issue herein. Held further, the decedent is not entitled to a theft loss deduction on account of the removal by the debtor of the collateral for the five loans from the State of Maryland. Joshua W. Miles, for the petitioners. John F. Dean, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By statutory notice dated February *262 5, 1980, respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1974 in the amount of $139,265.05. The issues for decision are (1) whether five loans made by the decedent W. Eugene Bounds to Winter Place Farm, Inc. were business debts, (2) and if so, whether the loans became worthless during 1977, and (3) whether, in the alternative, the decedent sustained a deductible theft loss in connection with the loans in 1977. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Decedent W. Eugene Bounds died on July 2, 1982 after the trial of this case. Petitioner, the Estate of W. Eugene Bounds, is an estate being administered by decedent's wife, Jane T. Bounds, and John B. Long, II. Jane T. Bounds resided in Salisbury, Maryland at the time of filing the petition herein. Mrs. Bounds is also petitioner by reason of her having filed a joint return with the decedent for the year in question. Mr. Long resided in Salisbury, Maryland at the time he was appointed co-personal representative of the estate. Decedent and his wife filed a joint *263 Federal income tax return for 1974 with the Internal Revenue Service Center, Philadelphia, Pennsylvania. In January of 1973, the decedent and another man named R. C. Holland formed a partnership called the B & H Company. The principal business activity of the partnership as stated on its 1977 return was that of investing money. It appears that this was predominantly done by means of lending money and earning income off the interest. The partnership also held some stock. In 1974 and part of 1975, the decedent was an owner of Mardel By-Products Corporation, a small business corporation. He was also an owner during this time of another small business corporation called Mayer Feed Concentrate, Inc. During 1974, the decedent was an officer as well as a director of these two corporations and of Dennis Storage Co., Inc.[1] *264 From 1974 to 1977, the decedent also served on the boards of directors of Truckers and Savings Bank, now the Equitable Trust Company. His duties as a director included attending regular meetings. In 1974 the decedent made a loan to "Mayer and Mardel." During 1975 and 1976, the decedent made a series of five loans to Winter Place Farm, Inc. (hereinafter Winter Place Farm) in the total principal amount of $232,500. The treatment of these five loans is the ultimate issue of this case. Four of the subject loans were made during 1975. Also during 1975 the decedent made a loan of $100,000 to Madison Gray and others. [2]
In 1974 the decedent sold his interest in Mardel By-Products Corporation. Up until the time of sale, he had been "fully employed" as the chief executive officer of the corporation. Thereafter, he was employed *265 by the buyer on a consulting basis for the better part of 2 years. [3] During 1976 the decedent made four loans to the Parkel Corporation ad one loan to Winter Place Farm. With respect to the loans made to Winter Place Farm, the decedent received $30,000 in interest during 1976. Of this amount, the decedent reported $12,000 in interest income on his income tax return and the remainder was reported on a partnership return. During 1975 and 1976, the decedent served as a consultant to the Darling-Delaware Co., Inc. This position required him to travel frequently to Delaware, sometimes on an average of 3 or 4 days a week. In 1976 the decedent's health failed and a major cancer operation incapacitated him for a number of *266 months. [4]
In January 1977 the decedent and Mr. R. C. Holland formed the Holland & Bounds Partnership. [5] The business of the partnership was listed on its 1977 Federal Partnership return as that of investing. This investment activity included the making of loans. The Holland & Bounds Partnership was capitalized largely by a $295,000 loan from the decedent. This money had been borrowed by the decedent in a loan transaction which was guaranteed by Mr. Holland. Holland & Bounds in turn loaned $300,000 to Mr. Madison Gray. [6] *267 During 1977, the decedent was still a partner in the B & H Company, having a 2-percent interest. [7] Also during 1977, the decedent made two loans, one to the Parkel Corporation and one to Holland & Bounds. [8] *268 During the years 1974 through 1977, the decedent personally made approximately 16 loans, including the five loans at issue herein. [9] Several of these loans were made to business or social acquaintances, as well as to entities in which the decedent held a direct ownership interest. The decedent spent very little effort making loans during 1974. He never advertised himself to be in the business of lending money. He maintained a small office in his home from which he conducted his lending activities. With respect to his lending activities during the years in issue, the decedent's books and records consisted of a sheet of paper *269 indicating amounts "in and out" and interest received for 2 of the 4 years involved. The decedent failed to file a schedule C in connection with his lending activities and listed his occupation as "executive" on each of his Federal income tax returns for the years 1974 through 1977. [10] The five loans to Winter Place Farm totaling $232,500 were secured by horses owned by that corporation. Mr. James B. Caine, the president of Winter Place Farm, gave Mr. Elton Wessells, a banker who had referred Mr. Caine to the decedent, a list of the horses to be used as collateral. Mr. Caine also delivered to Mr. Wessells an insurance policy on the horses in the face amount of $302,000. From October 15, 1975 through January 20, 1976, various promissory notes, financing statements and security agreements were prepared by the attorney representing Winter Place Farm. During this time, the horses designated as collateral were owned by Winter Place Farm and located at its facility in Salisbury, Maryland. *270 However, none of the horses used as collateral for the five loans were on the premises of Winter Place Farm during 1977. Mr. Caine either would not or could not say what became of the horses listed on the security agreements and given as security for the loans from the decedent. After an investigation by the decedent and his attorney, the horses were discovered in various jurisdictions across the United States. However, the horses apparently could not be obtained under applicable state law. In 1977, Winter Place Farm went into default with respect to loans from the decedent. Thereafter, the decedent commenced a civil action against Winter Place Farm. On April 6, 1977 the Circuit Court for Wicomico County, State of Maryland, entered judgment in favor of the decedent against Winter Place Farm in the amount of $406,250. On October 6, 1977, Winter Place Farm filed a petition under the Bankruptcy Act with the United States District Court for the District of Maryland. At the time the bankruptcy petition was filed, the only assets of Winter Place Farm were a 225 acre farm valued at $4 million, three tractors and accessories valued at $10,000, and office equipment valued at $500. The *271 decedent filed a proof of claim in the bankruptcy proceeding, but the first mortgageholder foreclosed and wiped out all the corporation's assets. The bankruptcy proceeding ultimately was dismissed. No criminal charges were ever brought against Winter Place Farm or its agents or employees with respect to the nonpayment of its debts to the decedent. On April 19, 1978 the decedent and his wife filed a Form 1045, Application for Tentative Refund, requesting a refund in the amount of $139,265.05 with respect to the taxable year 1974. The refund claim resulted from a net operating loss claimed in 1977 carried back to 1974. The net operating loss in turn resulted from the decedent's deduction of the loans to Winter Place Farm as business bad debts that became worthless in 1977. In his statutory notice, respondent recharacterized the deduction as a nonbusiness bad debt and allowed it as a short-term capital loss. OPINION The primary issue in this case is whether the five loans made by the decedent to Winter Place Farm are deductible as business bad debts in 1977. Section 166(a), I.R.C. 1954, allows a deduction for any debt that become worthless during the taxable year. However, section 166(d)(1)(A) *272 provides that section 166(a) does not apply to nonbusiness debts. Instead, a nonbusiness debt which becomes worthless during the taxable year is to be considered a loss from the sale or exchange of a capital asset held for not more than 1 year. Section 166(d)(1)(B). Section 166(d)(2) defines the term "nonbusiness debt" as a debt other than (A) a debt created or acquired in connection with a trade or business of the taxpayer, or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. It is against this statutory framework that we must determine whether the loans by the decedent to Winter Place Farm were business or nonbusiness debts. It is settled that the right to deduct bad debts as business losses is applicable only to the exceptional situation in which the lending activities of the taxpayer are so extensive and continuous as to elevate that activity to the status of a separate business. Imel v. Commissioner,61 T.C. 318, 323 (1973); Sales v. Commissioner,37 T.C. 576, 580 (1961); Rollins v. Commissioner,32 T.C. 604, 613 (1959), affd. 276 F.2d 368 (4th Cir. 1960).In the instant case, we do not believe that the decedent's activities *273 were of sufficient scope to place him in the trade or business of lending money. The decedent's lending activities during 1974 through 1977 lacked most of the attributes common to the carrying on of a trade or business. First of all, it does not appear that these activities occupied a substantial amount of the decedent's time and effort during this period. On the contrary, most of his time was divided between his duties as an employee and later a consultant of the Mardel By-Products Corporation, and, to a lesser extent, as an officer and director of several corporations. [11] The decedent himself stated at trial that he devoted very little time to the making of loans. Such passive conduct is not at all characteristic of the operation of a trade or business. See United States v. Henderson,375 F.2d 36, 41 (5th Cir. 1967). The decedent did not advertise his lending activities and did not maintain what could fairly be considered a separate office for such activities. Moreover, he did not keep books and records reflecting his lending activities.For this reason, the decedent was unable to reconstruct his purported "business" activities with any degree of accuracy. These factors all *274 weigh against him. See United States v. Henderson,supra at 41. It is also enlightening that the decedent apparently did not consider himself in the money-lending business during 1974 through 1977, as evidenced by the fact that he listed his occupation on his tax returns as that of executive and that he failed to file a schedule C in connection with his purported business. See Purvis v. Commissioner,530 F.2d 1332, 1334 (9th Cir. 1976), affg. a Memorandum Opinion of this Court. The decedent's accountant testified that he chose not to file a schedule C because he did not believe such filing would have affected the amount of tax due. We find this explanation to be unsatisfactory. During the years 1974 thorugh 1977, the decedent made approximately 16 loans in his individual capacity. Petitioner argues that several loans reported on the books of partnerships in which the decedent had an ownership interest were actually made by the decedent and should properly have been reported as his loans. We find this "concession" to be yet another attempt by petitioners to alter a previous *275 reporting stance to conform with their position in this case. We are not convinced. In the end, we are left with a series of loans made spasmodically over the relevant 4-year period. Although the occasional lending of large amounts of money indicates a hope of generating substantial income from such activity, it does not transform intermittent transactions into the operation of a trade or business any more than does the making of large, isolated investments in the stock market. The decedent did not conduct his lending activities like a business, he did not record them like a business, and he did not report them like a business. We do not believe this is the "exceptional situation" where the decedent's lending activities were sufficiently extensive and continuous to elevate them to the status of a separate business. Accordingly, respondent is sustained on this issue. Imel v. Commissioner,supra at 323. Respondent has conceded that, if we determine that decedent suffered a nonbusiness bad debt loss, such loss occurred in 1977. Petitioners alternatively argue that the decedent sustained a theft loss in 1977 as a result of the disappearance of the horses designated as collateral *276 for the loans. We disagree. It is undisputed that the loans from the decedent to Winter Place Farm established a debtor-creditor relationship between the parties. In such circumstances, any deduction for the loss resulting from the loans can be taken only pursuant to section 166 and not section 165. These sections are mutually exclusive. Sales v. Commissioner,supra at 579. Accordingly, the loss incurred by the decedent from the loan transaction cannot be deducted pursuant to section 165(c)(3) as a theft loss deduction. Even if a deduction were otherwise available under section 165, we would still be compelled to deny petitioners' claim for a theft loss. Section 165(c)(3) allows an individual a deduction for losses resulting from theft. The determination of whether a theft has occurred is made according to the law of the jurisdiction where the loss is sustained. Paine v. Commissioner,63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). While a criminal conviction may establish conclusively that a theft has occurred, the deduction does not turn on whether the thief has been convicted, prosecuted or even whether the taxpayer has chosen to move *277 against his malefactor. Vietzke v. Commissioner,37 T.C. 504, 210 (1961). Rather, the taxpayer must prove that, under the relevant state statute, a theft occurred. Jones v. Commissioner,24 T.C. 525, 527 (1955); Allen v. Commissioner,16 T.C. 163, 166 (1951). Petitioners have failed to prove that a theft occurred under Maryland law. They cite only a general larceny statute to support their argument that a theft occurred. They made no attempt to explain how Maryland law applies to the specific and somewhat unusual facts of this case. For this reason, we hold that petitioners have failed to prove their entitlement to a theft loss deduction. Decision will be entered for the respondent.
Footnotes
1. During 1974, the decedent earned wages totaling $114,422.49, dividends of $24,938.45, capital gains of $27,452.27, rental income of $16,547.64, income from small business corporations of $203,579.17, and partnership income of $281.20. For the year 1974, the decedent reported interest on his return totaling $6,561.91 as follows: ↩
First National Bank
$1,468.15
Green Hill Land Co.
48.00
Mardel By-Products
4,011.10
Maryland National Bank
15.00
Mayer Feed Concentrate
172.79
New York Life Insurance Co.
129.13
Truckers and Savings Bank
437.62
U.S. Treasury Bills
280.12
Total
$6,561.91
2. No interest income was reported by the decedent during 1975 through 1977 from the $100,000 loan. This apparently was due to the fact that the loan became uncollectable.↩
3. For 1975 the decedent reported wages of $13,800, dividends of $3,080, capital gains of $436,050, partnership and small business corporation income totaling $1,527, and miscellaneous income in the form of director's and consulting fees in the amount of $51,150. He also reported interest income totaling $38,717 as follows: ↩
First National Bank
$37,607
Green Hill Land Bank
48
New York Life Insurance Co.
140
Truckers and Savings Bank
681
Truckers and Savings Bank
241
Total
$38,717
4. For 1976 the decedent reported wages of $13,950, dividends of $3,137, consulting and director's fees of $76,050, rental income of $9,147.66, and partnership income of $228.36. He also reported interest income totaling $36,913.24 as follows: ↩
James Caine
$12,000.00
First National Bank
19,784.65
Green Hill Land Bank
48.00
New York Life Insurance Co.
150.80
Parkel Mortgage Note
4,200.00
Truckers and Savings Bank
729.79
Total
$36,913.24
5. The decedent was a 50-percent partner in Holland & Bounds. ↩
6. The balance sheet of Holland & Bounds for 1977 shows assets totaling $272,746.10 and consisting of $6,796.56 in cash and $265,949.54 in loans. The partnership reported net investment income of $16,152.76 and investment interest expenses of $39,135.43. Of this latter amount, $24,319.99 was paid to the First National Bank and $14,815.44 was paid to the decedent.
7. For 1977, the B & H partnership reported "Net Investment Income" of $10,447.87 and "Investment Interest Expense" of $3,397.02. The decedent's distributive share for 1977 from the B & H Company partnership was $208.95 in ordinary income and $11.62 in dividends and his distributive share from Holland & Bounds for 1977 was $8,076.38 of income and $19,567.72 of investment interest expense. The decedent and his wife filed a Form 4952, Investment Interest Expense Deduction, with their 1977 Federal income tax return, reporting $19,635.67 as their pro rata share of investment interest expense from partnerships. Of this amount, they offset the maximum allowable $18,285.33 against partnership interest income totaling $8,285.33 to arrive at a partnership loss of $10,000. ↩
8. During 1977 the decedent reported wages of $13,800, dividends of $3,462.48, director's fees of $1,175, partnership income of $8,285.33 and net rental income of $7,748.39.The decedent also reported interest income totaling $23,743.85 as follows: ↩
First National Bank
$ 179.07
Green Hill Land Co.
48.00
Holland & Bounds
14,815.44
New York Life Insurance
178.15
Parkel Corporation
1,662.45
Truckers and Savings Bank
6,729.18
U.S. Treasury--I.R.S.
131.56
Total
$23,743.85
9. An exact number of loans cannot be given because the decedent's records with respect to his individual lending activities were disorganized and incomplete.↩
10. The decedent each year provided his return preparer with schedules K-1 for all his partnerships and a schedule listing his dividend income and his interest income from both lending and investments.↩
11. In addition, during 1976 the decedent's health failed and he was incapacitated for a number of months.↩